UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| GERALD W. WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:10-CV-00122-BG |
| | ) | ECF |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

**Statement of the Case**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Gerald W. Walker seeks judicial review of a decision of the Commissioner of Social Security denying his application for disability insurance benefits. The United States District Judge transferred this case to the United States Magistrate Judge for further proceedings. Walker did not consent to proceed before the United States Magistrate Judge, and therefore the undersigned now files this Report and Recommendation.

An Administrative Law Judge (ALJ) held a hearing on May 7, 2009, and determined on August 26, 2009, that Walker was not disabled. Specifically, the ALJ held that Walker had the residual functional capacity (RFC) to perform the full range of light work and could therefore perform jobs that existed in significant numbers in the national economy during the relevant time period. The Appeals Council denied review on June 29, 2010. Therefore, the ALJ's decision is the Commissioner's final decision and properly before the court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (holding that the Commissioner's final decision

1

"includes the Appeals Council's denial of [a claimant's] request for review").

## Factual Background

Walker previously worked as a care provider at Lubbock State School, where he cared for institutionalized individuals with disabilities. (Tr. 131–32.) Before that, he did odd jobs through a temp agency. (Tr. 131.) Walker reported that he walked, stood, and handled big objects for approximately six hours per day in both jobs. (Tr. 132–33.) He reported that he frequently lifted twenty-five pounds as a care provider and frequently lifted fifty pounds in the odd jobs he performed. *Id.* Walker claims that he became disabled on June 11, 2008, with a history of foot problems dating back to 2004. (Tr. 23–24, 27, 120.)

On May 11, 2006, Walker fell and twisted his right foot while working in his yard. (Tr. 183, 279.) Michael McPherson, M.D. examined Walker at the emergency room and found that his foot was swollen, tender, and unable to bear weight. (Tr. 279–80.) Dr. McPherson reviewed x-rays of Walker's foot and ankle and diagnosed him with a nondisplaced fracture of his first metatarsal. (Tr. 280.) He also noted that Walker's bones were osteopenic and the range of motion of his foot was limited. *Id.* Mimi Zumwalt, M.D. applied a splint to Walker's lower leg. (Tr. 282.) Dr. Zumwalt reported that Walker had a non-displaced fracture and small cortical defect in his right foot; but his other extremities had functional range of motion, and he had 5/5 knee and grip strength. (Tr. 285.) Dr. Zumwalt gave Walker pain medicine and crutches and instructed him not to bear weight on his right foot. (Tr. 285–86.)

Dr. Zumwalt examined Walker on May 17, 2006, for reported numbness and intermittent aching pain in his right foot, which he rated 5/10. (Tr. 183–87.) According to Dr. Zumwalt, Walker reported that he was doing better but stopped taking his prescribed pain medication because it

caused a rash on his chest. (Tr. 183.) Dr. Zumwalt found tenderness in Walker's right foot, but his other extremities had 5/5 strength and normal alignment. *Id.* Dr. Zumwalt ordered Walker to "do partial weight-bearing as tolerated" but avoid "vigorous activities involving the right lower extremity[.]" (Tr. 184.)

At the emergency room on December 3, 2006, Christopher Piel, M.D. examined Walker, who reported that he slipped and fell in his house. (Tr. 271.) Dr. Piel found that Walker's foot had minimal swelling and a superficial abrasion. *Id.* E. Aye Liljeblad, M.D. reviewed x-rays of Walker's foot and ankle and reported that both displayed osteopenia. (Tr. 273–76.) Dr. Liljeblad also found that Walker's foot had "probable old healed fracture deformities of the proximal phalanges of the right 2nd and 3rd toes" but no acute fractures or dislocations. (Tr. 273.) Dr. Liljeblad described the deformities as mild and found no acute fractures or dislocations in Walker's ankle, which had "a tiny plantar spur." (Tr. 273–75.) Walker was discharged as stable and instructed to use crutches for three to five days. (Tr. 272.)

On February 15, 2007, Chantal McNair, M.D. examined Walker in the emergency room for complaints of right foot and ankle pain due to twisting his ankle on ice. (Tr. 259–62.) Dr. McNair reported that Walker's foot was tender and stiff but had no abrasion, erythema, swelling, or deformity. (Tr. 259.) She also found that Walker was unable to bear weight, but his back was not tender and had normal range of motion and normal alignment. (Tr. 259–60.) According to Dr. McNair, x-rays of Walker's right foot and ankle revealed osteopenia and mild degenerative changes but no evidence of fracture, subluxation, or acute abnormality. (Tr. 261.) Walker was discharged in stable condition with instructions to wear an ACE wrap and use crutches for a week and to try to put pressure on his foot and ankle so as to get off crutches in that time frame. *Id.*

3

On February 22, 2007, Jeanetta Cole, M.D. examined Walker in the emergency room for complaints of right hip pain. (Tr. 257–58.) Dr. Cole reported that Walker was in mild distress but had no right hip instability. (Tr. 258.) According to Dr. Cole, Walker's range of motion was decreased due to pain, and he had minimal swelling in his right ankle. *Id.* He was discharged in stable condition. *Id.* On February 28, 2007, Vance Birchfield, M.D. examined Walker in the emergency room for complaints of lower back pain. (Tr. 254–55.) Dr. Birchfield found that Walker had an antalgic gait and right lumbar tenderness but no swelling, ecchymosis, or abrasions. *Id.* Dr. Birchfield also found that Walker's alignment was normal and his extremities were in normal limits. (Tr. 255.) Walker was discharged in stable condition. *Id.*

On April 23, 2008, Antonio Gonzales, Jr., D.O. examined Walker at the emergency room for complaints of back pain on his right side. (Tr. 248–49.) Dr. Gonzales noted that Walker had an antalgic gait, but his extremities were normal with no swelling or tenderness. *Id.* Vikas Bhushan, M.D. reviewed a CT scan of Walker's lumbar spine and found multilevel degenerative disc bulge but no fracture, subluxation, or significant soft tissue injury. (Tr. 244.) Dr. Bhushan stated that the disc bulge "may compress the exiting L5 nerve root." (Tr. 245.) Dr. Bhushan also reviewed a CT scan of Walker's abdomen and reported "findings suggestive of acute sigmoid diverticulitis without perforation or abscess" and mild degenerative changes of the spine. (Tr. 245–46.) Walker was discharged in stable condition. (Tr. 246.)

Walker went to the emergency room on June 19, 2008, for lower back pain and abdominal pain. (Tr. 235–38.) Dan Berman, M.D. examined him and found that his back and extremities had normal range of motion. (Tr. 235–36.) On June 20, 2008, Vikas Bhushan, M.D. reviewed a CT scan of Walker's abdomen and reported that Walker had sigmoid diverticulitis with abscess formation.

4

(Tr. 228.) Dr. Bhushan also noted degenerative changes to Walker's spine. *Id.* Antibiotics were prescribed, and Walker was discharged on June 21, 2008, with instructions to eat a high fiber diet and do activity as tolerated. (Tr. 231–32.)

Walker filed an application for benefits on June 23, 2008. (Tr. 120.) On his application, he claimed that the following conditions limited his ability to work: status post broken right foot, osteoporosis and osteopenia in his right foot, and chronic back and right leg pain. (Tr. 124.) On June 26, 2008, a Social Security Administration field officer interviewed Walker via telephone regarding his application. (Tr. 120–22.) The field officer reported that Walker was very cooperative, but it was obvious that he was in a lot of pain. (Tr. 122.) The field officer further reported that he observed that Walker had no difficulties with understanding, concentrating, talking, or answering during the interview. (Tr. 121.)

On July 7, 2008, Walker submitted a pain report in connection with his application for benefits. (Tr. 139–46.) He reported having continuous pain in his right foot and lower back. (Tr. 140, 142.) He also stated that the foot pain became worse when he moved around or tried to stand a lot. (Tr. 140.) According to Walker, straining or heavy lifting caused his back pain, and sitting still with pillows behind his back helped relieve it. (Tr. 142–43.) He also stated that pain medication helped sometimes with both the foot and back pain. (Tr. 141, 143.) In addition, Walker reported that he had stomach pain for up to two hours per day, which was relieved by medication and drinking fluids. (Tr. 144–45.)

On July 20, 2008, Walker submitted a function report in connection with his application. (Tr. 147–54.) When asked what he did from the time he woke up until he went to bed, Walker reported that he usually woke up in the afternoon because he could not sleep through the night due

5

to back pain. (Tr. 147.) Walker stated that after waking up, he read his Bible and ate breakfast and sometimes lunch. *Id.* He further stated that he sometimes put pillows in the back of a chair to watch television. *Id.* According to Walker, he needed his wife to remind him to shave, brush his teeth, bathe, and take his medicine. (Tr. 149.) He stated that he sometimes made himself sandwiches, but his wife usually prepared his meals. *Id.* He further stated that he could go out by himself with crutches or a walker but could not drive. (Tr. 150.) Walker reported that he shopped once or twice a month, went to church as much as possible, did not have problems getting along with others, and got along well with authority figures. (Tr. 150–53.) He also reported that he could walk a half-block before needing to rest and could pay attention for up to thirty minutes at a time. (Tr. 152.)

On August 18, 2008, Piyush Mittal, M.D. examined Walker. (Tr. 203–205.) Dr. Mittal reported that Walker's back was tender with decreased range of motion, and he walked with a limp and a walker. (Tr. 204.) According to Dr. Mittal, Walker's right foot was tender and in a brace; but his ankle had normal range of motion, and he had 5/5 strength in all extremities. *Id.* Dr. Mittal examined x-rays of Walker's spine and right foot. *Id.* According to Dr. Mittal, Walker's lumbar spine showed mild degenerative changes, and his right foot showed some calcaneal spurs, which could be painful, but no fracture. *Id.* Dr. Mittal reported that Walker was alert, oriented, independent in activities of daily living, and in no acute distress. (Tr. 204.) Dr. Mittal stated, "I am not sure why [Walker] is wearing the brace at this period of time. The stability of the joints seems [] very normal at this time. The patient had a fracture two years ago and that is completely healed[.]" (Tr. 205.) Regarding Walker's right ankle pain, Dr. Mittal noted that his stability and prior ankle x-rays were completely normal. *Id.* Dr. Mittal also noted that Walker had back pain with mild arthritis. *Id.*

On August 27, 2008, Randal Reid, M.D. evaluated Walker's physical RFC. (Tr. 208–15.) Dr. Reid found that Walker could occasionally lift twenty pounds, frequently lift ten pounds, sit, stand, or walk for about six hours in an eight-hour work day, and was not limited in his ability to push or pull. (Tr. 209.) Dr. Reid determined that Walker could climb, balance, stoop, kneel, crouch, and crawl occasionally. (Tr. 210.) He stated that his determination of Walker's RFC took pain into consideration. (Tr. 215.)

Nabeel Dar, M.D. examined Walker on October 14, 2008, for complaints of foot and back pain. (Tr. 217–21.) Walker reported that the pain had a gradual onset over the past two days. (Tr. 218.) He described the pain as sharp. *Id.* Dr. Dar reported that Walker's gait was normal and that he was appropriate and in no acute distress. (Tr. 219–20.) Dr. Dar examined x-rays of Walker's right foot and found generalized osteopenia but no fracture, dislocation, or other acute bony abnormality. (Tr. 221.) Dr. Dar also found early calcaneal spurring. *Id.* Upon examining an x-ray of Walker's lumbar spine, Dr. Dar noted early degenerative osteophyte formation but no acute bony abnormality. (Tr. 226.) On the same date, Troy Wilborn, N.P. also examined Walker for foot and back pain. (Tr. 221–23.) Wilborn prescribed pain medication and recommended that Walker limit his activity. (Tr. 222.)

On October 31, 2008, Walker submitted a function report in connection with his application for benefits. (Tr. 165–72.) When asked what he did from the time he woke up until he went to bed, he reported that he got up to wash his face and brush his teeth. (Tr. 165.) He stated that he then watched the news and talked to any callers and used his walker or a crutch to walk outside. *Id.* He stated that he ate with his wife after she got home from work. (Tr. 165, 172.) According to Walker, he then got in the tub very carefully and went to bed after his bath. (Tr. 172.) He also reported that

7

it hurt to dress himself, get in the tub, and stand to shave because his foot got numb and caused him to trip and fall. (Tr. 166.) According to Walker, he made sandwiches and snacks for himself twice a day, went shopping every other week, and went to church every Sunday. (Tr. 167–69.) He stated that he could lift fifty pounds, walk one block without needing to rest, pay attention for up to one hour at a time, and follow written instructions. (Tr. 170.) He also stated that he got along well with authority figures. (Tr. 171.)

On March 7, 2009, A. Alex D'Cruz, M.D. examined Walker, who reported constant lower back pain, which he had experienced for three years. (Tr. 348–49.) According to Dr. D'Cruz, Walker reported that the pain radiated to his right calf and was aggravated by walking and prolonged sitting. (Tr. 348.) Dr. D'Cruz found that Walker's cognitive function was intact. *Id.* He also found that Walker had mild weakness in his feet, toes, and fingers and bilateral wasting of his tibialis anterior muscles. *Id.* According to Dr. D'Cruz, Walker's pinprick sensation was impaired just below his knees, and he had no vibration sensation in his toes. *Id.* Dr. D'Cruz found that Walker's ankle jerk reflex was absent, but his gait and posture were normal. *Id.* Dr. D'Cruz diagnosed Walker with peripheral neuropathy and possible lumbosacral raduclopathy and ordered tests and scans. (Tr. 349.)

From December 11, 2006, to March 9, 2009, Walker went to the Community Health Center of Lubbock approximately fourteen times for complaints of leg, foot, and back pain. (Tr. 190–202, 293–95, 302.) His subjective pain ratings ranged from 6/10 to 10/10. (Tr. 190, 201.) At an appointment on March 9, 2009, he reported depression due to his pain and inability to work. (Tr. 293.)

On March 18, 2009, a medical professional examined Walker for leg and lower back pain.

8

(Tr. 345.) The medical professional noted that Walker had no tenderness or deformity and full range of motion in his spine. *Id.* Depression was also noted. *Id.* On April 1, 2009, the medical professional examined Walker at a follow-up appointment. (Tr. 336.) The medical professional found that Walker had a low affect and prescribed an anti-depressant. (Tr. 334, 336.)

On May 7, 2009, Walker testified at a hearing before an ALJ, where he was represented by counsel. (Tr. 22–32.) A vocational expert also testified at the hearing. (Tr. 32–33.)

On November 2, 2009, Roberta J. Beals, D.O. examined Walker at a follow-up appointment. (Tr. 358–60.) Dr. Beals reported that Walker's health status was fair and unchanged. (Tr. 358.) According to Dr. Beals, Walker reported that his daily activity was low with no change in eating habits or sleeping patterns. *Id.* Dr. Beals reported that Walker had intermittent tingling and paresthesia in his right foot but no abnormal balance. *Id.* She found that he was cooperative with appropriate mood and affect and normal judgment. (Tr. 359.) She further found that his psychiatric condition was improving. *Id.* She also found that he had decreased range of motion in his lumbar spine and hip and a spasm in his right ankle. *Id.* Dr. Beals diagnosed Walker with chronic pain syndrome, depression, peripheral autonomic neuropathy, and spinal stenosis of the lumbar region. (Tr. 360.)

## **Standard of Review**

A plaintiff is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A) (2011).

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis

to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); *see also* 20 C.F.R. § 404.1520(a)(4) (2011). "The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to steps 4 and 5, the Commissioner must assess a claimant's residual functional capacity (RFC), defined as "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1520(a)(4)(iv)–(v), 404.1545(a)(1).

Judicial review of a decision by the Commissioner is limited to two inquiries: a court must "consider only whether the Commissioner applied the proper legal standards and whether substantial evidence in the record supports the decision to deny benefits." *Audler*, 501 F.3d at 447. "Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). A finding of no substantial evidence is appropriate "if no credible evidentiary choices or medical findings support the decision." *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

**Discussion**

Walker contends that the ALJ's decision requires reversal because it did not sufficiently account for Walker's pain or depression. Among Walker's contentions is that substantial evidence does not support the ALJ's finding that "there was no evidence in the record that [Walker] was diagnosed as having depression from June 11, 2008, through his date last insured." (Tr. 16; Pl.'s Br. 14.) Although substantial evidence supports the ALJ's findings regarding pain, Walker's argument regarding depression has merit and requires remand.

I.  Substantial evidence supports the ALJ's findings regarding Walker's pain.

Symptoms such as pain render an individual disabled only to the extent that "alleged functional limitations and restrictions due to [pain] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2). To the extent that an individual's statements about the intensity, persistence, and limiting effects of pain are inconsistent with objective medical evidence, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). "[P]ain must be constant, unremitting, and wholly unresponsive to therapeutic treatment to be disabling." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). An ALJ's credibility findings regarding the intensity and persistence of pain are not reversible error if they are supported by substantial evidence. *See Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994).

In his denial of benefits, the ALJ acknowledged Walker's claims that he had severe,

continuous pain in his lower back and right foot and leg. (Tr. 16–17, 124, 140, 142, 150, 159.) The ALJ also recognized Walker's allegations that his condition affected his ability to kneel, use his hands, reach, sit, stand, walk, and move and that he used a walker due to tripping, falling, and losing his balance. (Tr. 17, 124, 152, 159, 167.) Finally, the ALJ acknowledged Walker's testimony that swelling and cramps in his right foot caused him to trip. (Tr. 17, 28, 30.) The ALJ held that Walker's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not credible[.]" (Tr. 18.)

The following substantial evidence supports this conclusion: As noted by the ALJ, Dr. Mittal found that Walker had full range of motion in his right ankle and 5/5 strength in all extremities despite tenderness in his back and right foot on August 18, 2008. (Tr. 17–18, 204). Dr. Mittal also stated that Walker's stability was completely normal, his fracture from two years prior was completely healed, and he was independent in his activities of daily living. (Tr. 17–18, 204–05.) The ALJ further noted that on June 19, 2008, Dr. Berman found that Walker had normal range of motion, alignment, and tone in his back and extremities despite complaints of lower back and abdominal pain. (Tr. 17–18, 235–36.) As also noted by the ALJ, Dr. Dar reported that Walker had a normal gait despite his complaints of sharp pain on October 14, 2008. (Tr. 17–18, 218, 220.) Dr. Dar also found that x-rays of Walker's right foot showed generalized osteopenia and early calcaneal spurring but no fracture, dislocation, or other acute bony abnormality. (Tr. 17–18, 221.) In addition, the ALJ noted that Dr. D'Cruz found that Walker's gait and posture were normal in spite of mild weakness in his feet and toes and peripheral neuropathy. (Tr. 17–18, 348–49.) The ALJ further noted that Walker reported that he took care of his own personal hygiene, prepared food for

himself twice a day, shopped every other week, went to church every Sunday, and could lift fifty pounds and walk a block without needing to rest. (Tr. 17, 165–72.) As noted by the ALJ, Walker testified and indicated in other records that medication helped relieve his pain. (Tr. 17, 25, 141, 143, 147.) As also noted by the ALJ, Dr. Mittal found no swelling, numbness, or tingling in Walker's feet or ankles, which was consistent with findings of treating physicians. (Tr. 17, 203, 249, 255, 259.)

In view of the foregoing substantial evidence, the ALJ's treatment of Walker's subjective complaints of pain does not require remand.

II.  Substantial evidence does not support the ALJ's conclusion that depression was not one of Walker's medically determinable impairments.

In making a disability determination, an ALJ must consider the effect of all medically determinable impairments that began "on or before the date the claimant was last insured." *Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000). A medically determinable impairment is one that is "demonstrated by 'medically acceptable clinical and laboratory diagnostic techniques.'" *Greenspan v. Shalala*, 38 F.3d 232, 239 (5th Cir. 1994) (quoting 42 U.S.C. § 423(d)(3)).

In the instant case, the ALJ found that depression was not one of Walker's medically determinable impairments because there was "no evidence in the record that [Walker] was diagnosed as having depression from June 11, 2008, through his date last insured." (Tr. 16.) The record does not support this conclusion. Walker was last insured on March 31, 2009. (Tr. 120.) A treating medical professional noted that Walker reported depression on March 9, 2009. (Tr. 293.) Another healthcare provider noted that Walker displayed depression at a follow-up appointment on March 18, 2009. (Tr. 345.) Walker was first treated for depression on April 1, 2009, when he was prescribed an anti-depressant. (Tr. 334, 336.) A medical professional would not have treated

13

Walker for depression without finding that depression was demonstrated by medically acceptable techniques. In view of the March medical records noting depression, the medical record indicating that Walker was treated for depression on April 1, 2009, is sufficient to establish that the onset of Walker's depression was at least as early as the preceding day. Medical records from appointments after the expiration of the insured period can establish an onset date of an impairment prior to the expiration of insured status. *See Ivy v. Sullivan*, 898 F.2d 1045, 1048–49 (5th Cir. 1990). "To hold otherwise would unfairly penalize those claimants who, through no fault of their own, cannot produce contemporaneous medical records." *Id.* at 1049.

For the foregoing reasons, "no credible evidentiary choices or medical findings support" the ALJ's conclusion that depression was not one of Walker's medically determinable impairments as of March 31, 2009. *Harris*, 209 F.3d at 417.

## Conclusion

For the foregoing reasons, this court recommends that the United States District Court **REVERSE** the Commissioner's decision and **REMAND** this case for administrative proceedings consistent with this opinion.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2011); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate

judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: October 27, 2011.

_____
NANCY M. KOENIG
United States Magistrate Judge